426 A.2d 649

**Betti Lou KARDIBIN and Russel P. Kardibin**

v.

**ASSOCIATED HARDWARE**

v.

**Samuel M. HYMAN, Trustee, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 14, 1979.

Filed Feb. 20, 1981.

588

Warren D. Ferry, Pittsburgh, for appellant.

Louis H. Ceraso, New Kensington, for Kardibin, appellees.

Robert A. Nedwick, Pittsburgh, for Associated Hardware, appellee.

Before CERCONE, President Judge, and MONTGOMERY and LIPEZ, JJ.

CERCONE, President Judge:

This is an appeal from the denial of the additional defendant's motions for a new trial and for judgment n. o. v.[1]

On January 13, 1975 Betti Lou Kardibin and her daughter Lisa were shopping at the Hillcrest Shopping Center in Westmoreland County. It was early evening and they were shipping hurriedly. Russel Kardibin, Betti Lou's husband, was waiting in the car in the shopping center parking lot. As the two shoppers approached the Associated Hardware Store, some clocks in the window caught Mrs. Kardibin's eye. Several feet from the door to the hardware store Mrs. Kardibin caught her foot and fell to the sidewalk. She was helped to her feet by her daughter Lisa and a passerby, Mrs. Brown. Lisa and Mrs. Kardibin entered the hardware store and informed Louis Deda, the manager, about the accident. They did not go outside to show him where the accident occurred, but pointed through the window, to one side of the door, indicating the general locality of the mishap. Deda told them Mrs. Kardibin was not the first to trip there, and he told them that he had reported a defect in the concrete to the Shopping Center's maintenance man approximately a month before. Mr. Kardibin subsequently took his wife for emergency treatment at a nearby hospital.

When the case came to trial a jury was impanelled but, before the plaintiffs could present their case, one of the twelve requested to be excused because of a personal emergency. Upon agreement of counsel to try the case with eleven jurors, of which nine were to constitute a sufficient

1. The named additional defendant, Samuel Hyman, is trustee of Hillcrest Shopping Center by virtue of a trust agreement. For convenience sake, we shall simply refer to Hillcrest Shopping Center.

number to render a verdict,[2] the trial judge released the twelfth juror as requested. The case proceeded to trial, but when it came time to charge the jury, counsel for the shopping center requested that the court instruct the jury that a verdict could only be rendered by ten of the eleven jurors instead of the nine earlier agreed upon. Appellant contended below, as it does here, that the law of the Commonwealth requires a verdict of at least ⅚ of the jury in civil cases, and that its earlier agreement to accept a verdict by nine of the eleven jurors (slightly less than ⅚) was based on a mathematical miscalculation which, in effect, made any vote by less than ten jurors contrary to law. The court refused the instruction and the jury retired to deliberate. In his instructions to the jury, the trial judge required them to answer special interrogatories, which he drafted, in the event that they were to find in the plaintiffs' favor. The juror then returned a vote in the sum of $15,000 in favor of the Kardibins by a nine-two vote, and answered the special interrogatories.[3] On the basis of the special interrogatories

2. In chambers the trial judge stated the agreement for the record and counsel voiced their approval:

"THE COURT: Let the record show the attorneys are in my chambers, and I have just informed them that Juror No. 11, Robert Clark, notified my secretary that his mother was rushed to the Intensive Care Coronary Unit last night and wanted to know whether or not there was any way be could be discharged from the case. I presented the problem to the attorneys, and they have agreed that we could continue with eleven jurors; and that a verdict would be produced by nine out of the eleven jurors.

Gentlemen: Is that correct?

MR. GREEN: Yes, Your Honor.

MR. NEDWICK: Yes, Your Honor.

MR. FERRY: Yes, Your Honor."

3. The special interrogatories, as answered, read:

"If you find a verdict in favor of the Plaintiffs, answer the following questions:

1. Where was the defect which caused Plaintiff to fall?

(check appropriate answer)

( ) a. Within the recessed area which was a part of the Hardware Store

(X) b. At the boundary between the sidewalk area and the recessed area of the Hardware Store. (This boundary line is indicated by the red line on Original Defendant's Exhibit "A")

the original defendant, Associated Hardware, moved that the verdict be molded to hold Hillcrest Shopping Center solely liable. The trial judge accepted the motion and molded the verdict accordingly. Hillcrest Shopping Center filed motions for judgment n. o. v. and for a new trial. The en banc court denied both motions and this appeal followed.

On appeal the Shopping Center raises three issues: whether the denial of its motion for compulsory non-suit was proper; whether the molded verdict was proper; and whether a verdict rendered by nine of eleven jurors violates the Act of October 7, 1975, P.L. 374, No. 107, § 1, 17 P.S. § 925 (now substantially re-enacted, Act of July 9, 1976, P.L. 586, No. 142, § 2, eff. June 27, 1978, amended April 28, 1978, P.L. 202, No. 53, §§ 10(57), 21, eff. June 27, 1978, 42 Pa.C.S. § 5104),[4] and Article I, § 6 of the Constitution of 1873 as amended in 1971. We address the issues seriatim.

 We consider initially the propriety of the court's refusal to grant the Shopping Center's motion for compulsory non-suit. In reviewing a denial of such a motion we must consider the plaintiffs' evidence in a light most favorable to them and giving them the benefit of every reasonable infer-

> 2. Was the defective condition due to the fact that the concrete floor was not level?
> (Answer yes or no) Yes
> 3. Did the Original Defendant, Associated Hardware, have knowledge of the defect that caused Plaintiff to fall? Yes
> 4. Did George Zabec, employee of Hillcrest Shopping Center, know of the defect which caused the Plaintiff to fall before January 13, 1975, the date of the accident? Yes
> 5. Was the defect which caused Plaintiff to fall such a defect that it should have been discovered by the Hillcrest Shopping Center by a reasonable inspection of that part of the premises? Yes."

4. 42 Pa.C.S. § 5104(b) which re-enacted identically the earlier Act reads:
> "Civil verdicts:—In any civil case a verdict rendered by at least five-sixths of the jury shall be the verdict of the jury and shall have the same effects as a unanimous verdict of the jury."
> Article I, § 6 as amended May 18, 1971 reads:
> "Trial by jury shall be heretofore, and the right thereof remain inviolate. The General Assembly may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case."

ence which can be drawn therefrom. *In re Green*, 486 Pa. 613, 406 A.2d 1370 (1979); *Bromberg v. Gekoski*, 410 Pa. 320, 189 A.2d 176 (1963); *Fox v. Lyon*, 27 Pa. 9 (1856). Furthermore, it has long been the law in Pennsylvania in "falldown" cases that the pedestrian has the burden of proving the existence of a defective condition and the knowledge, actual or constructive, of the real estate possessor of the condition prior to the accident. *Bromberg*, supra; *Freund v. Hyman*, 377 Pa. 35, 103 A.2d 658 (1954).

■ The Shopping Center contends that the Kardibins failed to present sufficient evidence to make out a prima facie case, and that it was error not to have granted its motion for compulsory non-suit. Appellant argues primarily that the Kardibins failed to establish the actual cause of Mrs. Kardibin's fall. In support of its argument the Shopping Center cites three cases, of which we find none persuasive: *Cuthbert v. Philadelphia*, 417 Pa. 610, 209 A.2d 261 (1965); *DuBois v. Wilkes-Barre*, 410 Pa. 155, 189 A.2d 167 (1963); *Freund*, supra. In all three of these cases the plaintiff was injured as the result of a fall, but in none of them was the plaintiff able to establish the cause of the fall by other than conjecture. There the plaintiffs searched the accident site for an agency which could have occasioned the mishap and, finding a defective condition in the pathway, concluded that it could only have been the defect that caused the accident. In none of these cases was there eyewitness testimony directly linking the fall to the defective condition. See also *Houston v. Republican Athletic Ass'n*, 343 Pa. 218, 22 A.2d 715 (1941); *Hillelson v. Renner*, 183 Pa.Super. 148, 130 A.2d 212 (1957); *Rogers v. South Philadelphia Nat'l Bank*, 160 Pa.Super. 154, 50 A.2d 697 (1947). The instant case presents a considerably different situation. Here, Mrs. Kardibin testified in her case-in-chief that the sidewalk caused her fall, and that she found her foot still in the offending defect after she arose:

A. All of a sudden just felt like I just short of sunk, like. I can't even hardly explain it. My foot, like, went in, and I just went down. It happened so darn quick.

Q. Do you recall, if you can describe for us, how you went down, the best of your ability.

A. I can recall, like, my foot getting in something and going down. And the first thing I thought ... I'm going to land in the showcase window. So I reached out like this, more to protect myself. Like on an angle I went down.

Q. You're indicating you reached with your left arm?

A. Left.

Q. Then what happened?

A. I went down. And I don't know ... I must have went and screamed. I don't know what I did. But Lisa ran over to me. But the best I can recall is I tried to get up and I was sort of dizzy....

Q. After you got up, did you examine the roadway or the pavement to determine why you fell or what caused you to fall?

A. *Yes, my foot was in it. And I could see it was like this, like sunken in.*

Q. *You're indicating sort of a depressed V?*

A. Yes, like I said one other time, it was like a V. It went down in.

Q. How close was that depressed area or that V to the base of the show window?

A. About—Oh, about two feet, three feet.

(N.T. 154–156) (emphasis added). Furthermore, Lisa Kardibin testified that she saw her mother's foot in the defective spot just as Mrs. Kardibin was falling. The testimony of Lisa Kardibin, Mrs. Kardibin's daughter, was a substantial detailed support of her mother's description of the fall.

From the testimony in plaintiff's case there would clearly seem to be enough evidence to place the question before the jury. The Shopping Center argues, however, that testimony concerning the location of the defect in the sidewalk indicates that the actual cause of the fall was unknown to either Mrs. Kardibin or Lisa. The former stated that she fell "about two feet, three feet" from the hardware store's show

window. Her daughter placed the accident at three or four feet from the window, although she expressed doubt as to the approximation. The confusion about the location of the crevice which occasioned the fall does not affect the testimony concerning the cause, but goes rather to the witnesses' credibility and their ability to estimate distance.

The Shopping Center further contends that there is insufficient evidence to show that it had knowledge of the defect in the concrete surface outside the Associated Hardware. The record clearly shows that Louis Deda, the hardware store manager, testified during the appellees' case-in-chief (and again later) that he had informed George Zabec, the maintenance man of the shopping center, of the defect in December, 1974. (N.T. 95–96, 233–34). Giving appellees the benefit of all reasonable inferences and reading the evidence in a light most favorable to them, it is clear they met their burden and established a prima facie case of negligence and, consequently, the denial of the motion for compulsory nonsuit was proper.

Appellant next assigns as error the molding the verdict by the court in conformance with the motion of Associated Hardware, the original defendant. The Shopping Center argues that the jury found liability on the part of both defendants despite the special interrogatories. It bases its argument on the fact that the jury was permitted to take out a copy of the lease between Associated Hardware and the appellant when they retired to deliberate.[5] The Shopping Center concedes, in effect, that lease construction or interpretation is normally a court function, but argues that

5. The lease had been "sanitized" of a provision dealing with Associated Hardware's insurance coverage. The paragraph on which the shopping center bases the argument of joint liability reads:

"The Lessor, at the expense of the Lessor, during the initial term of this Lease and any renewal term, shall maintain, illuminate, clean ... the outdoor facilities of the shopping center and stripe the parking area, and, except as may be specifically provided herein to the contrary, shall keep in good condition, and shall make all repairs necessary to preserve in good order, the outdoor facilities of the shopping center and the roof, exterior walls, level of concrete floor and structural parts of the Leased Storeroom."

by allowing the jury to consider its liability under the lease the court altered this normal question of law into a question of fact, which could not be overruled by the court on motion to mold the verdict. The Shopping Center further argues that a molded verdict is proper only in a case where the jury's intention is clear, and that such is not the case instantly.

We agree with appellant when it says that a motion for a molded verdict should only be granted in a clear case, *May v. Pittsburgh Railways Co.*, 209 Pa.Super. 126, 224 A.2d 770 (1966). It is equally certain that questions such as contract or lease interpretation are questions of law and lie peculiarly within the domain of the court to decide. *Reitmeyer v. Sprecher*, 431 Pa. 284, 243 A.2d 395 (1965); *Donnelly v. Fred Whittaker Co.*, 364 Pa. 387, 72 A.2d 61 (1950); *National Products Co., Inc. v. Atlas Financial Corp.*, 238 Pa.Super. 152, 364 A.2d 730 (1976); *Lot v. Guiden*, 205 Pa.Super. 519, 211 A.2d 72 (1965). The record reveals that the jury was not instructed to determine the liability of the defendants *inter se*. Indeed, the jury came back with a question about whether they were supposed to do just that, and they were instructed not to. The trial judge instructed them concerning the common law duty of possessors of land to protect those who come on to the land; they were also informed about one's duty to inspect the land in his possession or control. Nothing was said about the legal effect of the lease. We find appellant's argument on this point unpersuasive.

Appellant also argues that the jury's intention was not clear and, therefore, the verdict ought not to have been molded. We find quite the contrary to be true. The jury obviated any necessity of its considering the Shopping Center's duty to inspect by finding that it had actual knowledge of the defect in the sidewalk. And, the jury found quite clearly, that the Shopping Center was in possession of the property since it found that the defect was on the boundary line between the leased premises and the Shopping Center common areas, i. e., the sidewalk. To the extent that it was

permitted, the jury found the Shopping Center liable. The ultimate question under the lease was not presented to the jury, so they could have expressed no intention as to it. There was no error in molding the verdict based on the jury's special findings and the court's interpretation of the lease agreement. Additionally, we note that the interpretation placed on the lease is in accord with the Restatement (Second) of Torts § 357.[6] See *Reitmeyer*, supra.

As its last assignment of error the Shopping Center questions the validity of a verdict rendered by nine of eleven jurors. Appellant contends that such a verdict violates the Act of October 7, 1975, P.L. 374, No. 107, § 1; 17 P.S. § 925,[7] and Article I, § 6 of the Commonwealth's Constitution as it was amended in 1971. Because one of the jurors sought to be excused for personal reasons counsel agreed to try the case before a jury of eleven. They also agreed that nine jurors would be sufficient to render a verdict, and in fact only nine of the eleven joined in the verdict. Appellant now argues that it was beyond the litigants' power to accept such a verdict by virtue of the act of the Legislature and Article I, § 6 of the Commonwealth's Constitution. In support of its argument, the Shopping Center cites the statute, the Constitution, and two cases: *Balin v. Pleasure Time, Inc.*, 243 Pa.Super. 61, 364 A.2d 499 (1976); *DeCarbo v. Ellwood City*, 3 Pa.Cmwlth. 569, 284 A.2d 342 (1971).

We begin our discussion by noting that this appears to be a case of the first impression in Pennsylvania. Article I, § 6 of the 1873 Constitution, as it was amended by referendum

---

**6.** Restatement (Second) of Torts § 357 reads:

"A lessor of land is subject to liability for physical harm caused to his lessee and others upon the land with the consent of the lessee or his sublessee by a condition of disrepair existing before or arising after the lessee has taken possession if

(a) the lessor, as such, has contracted by a covenant in the lease or otherwise to keep the land in repair, and

(b) the disrepair creates an unreasonable risk to persons upon the land which the performance of the lessor's agreement would have prevented, and

(c) the lessor fails to exercise reasonable care to perform his contract."

**7.** Now re-enacted at Judicial Code, 42 Pa.C.S. § 5104(b).

in 1971, granted to the legislature the power to require only ⅚ majority verdicts in civil cases. The legislature acted under this new grant to permit the ⅚ verdict by the Act of October 7, 1975. From the legislative history it would seem the legislature intended the Act to extend to the full limits permitted by the amendment.[8] Neither the Constitution nor the Act gives any indication that the parties are restricted from accepting a non-unanimous verdict of less than ⅚; therefore, the question becomes whether the parties to a civil action may stipulate to accept a verdict of less than a ⅚ majority.

■ Generally, the law in Pennsylvania on the questions of stipulations has long been settled. Any stipulation by the parties to a civil action is permissible so long as it affects neither the court's jurisdiction—that is, does not attempt to create jurisdiction where there would otherwise be none—nor the court's due order of business or convenience. See *Foote v. Maryland Cas. Co.*, 409 Pa. 307, 186 A.2d 255 (1962); *Foley Brothers, Inc. v. Commonwealth*, 400 Pa. 584, 163 A.2d 80 (1960); *Muir v. Preferred Accident Ins. Co.*, 203 Pa. 338, 53 A. 158 (1902); *Chamberlain of Pittsburgh, Inc. v. Fort Pitt Chem. Co.*, 237 Pa.Super. 528, 352 A.2d 176 (1975). The Shopping Center cites *DeCarbo*, supra, and *Balin*, supra, as authority to support its contention that a stipulation to accept a verdict of less than ⅚ was illegal. Both of these cases are distinguishable from the case at bar. Furthermore, the *DeCarbo* case agrees fully with the authorities on stipulations which we have cited, and *Balin* turned not on a stipulation question, but on the chancellor's failure to file an adequate adjudication. Since the stipulation *sub judice* cannot be said to create jurisdiction in the court or affect its due order of business, if it be infirm, it must be so solely under the Constitution.

■ Our courts have not yet considered the ⅚ majority verdict provision of Article I, § 6, but we long ago disposed

8. An attempt was made to limit the ⅚ majority verdict to those cases where counsel agreed to accept it, but this amendment to the Act was defeated. 1975 Pa.Sen.Leg.J. 807–809.

of the question of verdicts by a panel of less than twelve.
This court stated the following in the now famous case of
*Commonwealth v. Beard*, 48 Pa.Super. 319 (1911):

> Granted that under constitutional and statutory provisions
> in civil cases a jury may be wholly dispensed with, and
> they may be taken out of court by reference to arbitra-
> tion, yet if they are not so disposed of, if they are brought
> to trial before a jury, it is certain that numerically the
> latter is exactly the same as in a criminal case, and that,
> in the one as in the other, the integrity of its ordained
> composition as a constitution tribunal for the trial of the
> cause is equally affected by the withdrawal of one of the
> jurors; and here is exactly the same reason for treating
> the proceeding as a species of extra-constitutional and
> extra-statutory arbitration before a tribunal unknown to
> the law. Nevertheless every one familiar with civil prac-
> tice knows that just that thing is constantly done without
> doubt of its competency or thought of ensuing difficulty.
> Its legitimacy, indeed, ... does not seem ever to have
> been mooted in our courts; a circumstance, ... which is
> evidence of its lawfulness. But, properly speaking, nei-
> ther in a civil nor in a criminal case, does the defendant by
> agreeing to go on before eleven jurors create or submit
> himself to a new tribunal.... In truth, as appears by the
> best considered cases on both sides of the question, which
> the accused really consents to is simply not to object to an
> irregularity not indeed in the original constitution of the
> tribunal appointed for his trial, but in the continuing
> composition of one of its parts, occurring by reason of
> unavoidable circumstances, as a subsequent stage of the
> proceeding, after the jurisdiction of the tribunal had at-
> tached, and existing at the rendition and reception of the
> verdict. He does so at a time and under conditions when
> perfectly free to choose whether so to consent or not,
> without any liability to prejudice by reason of a refusal to
> consent. Having for reasons of his own given his consent
> and taken the chances of the result, he should, upon every
> analogy in our law and upon the most obvious grounds of

good faith and justice be precluded from retracting it when disappointed in the result.

*Id.* at 324. And see *Commonwealth v. Hawman*, 48 Pa.Super. 344 (1911). For guidance in deciding the question of whether a verdict of less than ⅚ of the jury may be approved, we turn to our sister state, New York, which has an identical constitutional provision. New York Const. of 1894, Article I, § 2, as amended, 1938. The case of *Neumann v. Kurek*, 175 Misc. 238, 22 N.Y.S.2d 950, aff'd 264 App.Div. 751, 35 N.Y.S.2d 264 (1940) presents an analogous situation. The only difference of any significance between the instant case and *Neumann* is that in the New York case there was no statute authorizing the ⅚ verdict. In considering a stipulation identical to the instant one, the New York court said:

> Plaintiffs have apparently overlooked the important distinction which exists between civil and criminal cases in respect of the power of the parties to stipulate away constitutional provisions in their favor. The very case upon which plaintiffs place their reliance (*Cancemi v. People* [citation omitted]) emphasizes that distinction as follows:
>
> "There is, obviously, a wide and important distinction, between civil suits and criminal prosecutions, as to the legal right of a defendant to waive a strict substantial adherence to the established, constitutional, statutory and common law mode and rules of judicial proceedings. This distinction arises from the great difference in the nature of such cases, in respect to the interests involved and the objects to be accomplished.
>
> "Civil suits relate to and affect, as to the parties against whom they are brought, only individual rights which are within their individual control and which they may part with at their pleasure. The design of such suits is the enforcement of merely private obligations and duties. Any departure from legal rules in the conduct of such suits, with the consent of the defendants, is therefore a voluntary relinquishment of what belongs to the defend-

ants exclusively; and hence there is manifest propriety in the law allowing such consent to have the effect designed by it, in most cases, as to matters within the jurisdiction of the courts."

The decision of the Court of Appeals in that case, to the effect that the defendant's consent to be tried by less than twelve jurors was a nullity, was predicated upon the fact that he was the defendant in a *criminal* prosecution. It is to be noted the constitution in force at that time, Article I, Section 2, State Constitution of 1846, although permitting a waiver of a trial by a jury "in all civil cases", contained no authorization of a similar waiver in criminal cases, even those in which the crime charged was not punishable by death. Our present constitution, however, permits the waiver of a jury trial even in criminal cases "except those in which the crime charged may be punishable by death". If the parties to a civil case may validly agree to have their rights determined without any jury or with a jury of eleven or less members, it follows that they may with equal validity consent to accept a verdict arrived at by a specified number of jurors, even that of a bare majority. A party may waive constitutional rights designed for his benefit. *Baird v. Mayor, etc., of City of New York*, 74 N.Y. 382, 386. It is interesting to note that, notwithstanding the constitutional right of a jury trial contained in the Seventh Amendment to the Federal Constitution, the United States Supreme Court has adopted a rule which expressly provides that "the parties may stipulate that the jury shall consist of any number less than twelve or that a verdict or a finding of a stated majority of the jurors shall be taken as the verdict or finding of the jury." Rule 48, Rules of Civil Procedure of the District Courts of the United States, 28 U.S.C.A. following section 723c. This clearly indicates that our highest court deemed it to be within the power of the parties in civil causes to consent to the acceptance of a verdict of even a bare majority of the jury, despite the constitutional guarantee of a jury trial. [Dobie, The Federal Rules of Civil Procedure, 25 Va.L.Rev. 261 (1939)].

*Id.* at 240–241, 22 N.Y.S.2d at 952–953. We are in complete agreement with the New York court. Therefore, we hold that the stipulation did not violate either Article I, § 6 of the Pennsylvania Constitution of 1873, nor the Act of October 7, 1975, and that it was not error to deny the appellant's requested instruction which would have required a verdict be approved by no fewer than ten of the jurors. We affirm in full the decision of the court en banc dismissing the Shopping Center's post-verdict motions.

Order and judgment affirmed.